# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SERVICE EMPLOYEES
INTERNATIONAL UNION NATIONAL
INDUSTRY PENSION FUND, *et al*.,

     *Plaintiffs*,

    v.

CASTLE HILL HEALTHCARE
PROVIDERS, LLC,

     *Defendant*.

Civil Action No. 17-1666 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Service Employees International Union National Industry Pension Fund, a multiemployer employee pension plan, and its Trustees (collectively the "Fund") bring this action pursuant to the Employee Retirement Income Security Act of 1974 seeking, among other things, to collect unpaid contributions, interest, and liquidated damages from Defendant Castle Hill Healthcare Providers, LLC ("Castle Hill"). Dkt. 1 at 2 (Compl. ¶ 1). The dispute centers around whether Castle Hill complied with its obligations under ERISA, as amended by the Pension Protection Act of 2006 and the Multiemployer Pension Reform Act of 2014, and its 2010 collective bargaining agreement with the Service Employees International Union Local 1199 to make supplemental contributions to the Fund, which fell into "critical status" in 2009. The parties agree that supplemental contributions were required, but they disagree about the extent and nature of that obligation.

The case is now before the Court on the Fund's motion for summary judgment. Dkt. 15. For the reasons explained below, the Court will grant the Fund's motion in part and will deny it in part without prejudice.

## I.  BACKGROUND

### A.  Statutory Background

The Fund brings this case pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* "One type of pension plan regulated by ERISA is a multiemployer pension plan, in which multiple employers pool contributions into a single fund that pays benefits to covered retirees who spent a certain amount of time working for one or more of the contributing employers." *Trustees of Local 138 Pension Trust Fund v. F.W. Honerkamp Co.*, 692 F.3d 127, 129 (2d Cir. 2012) (hereinafter "*F.W. Honerkamp*"). Under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), Pub. L. No. 96-364, 94 Stat. 1208, an employer that is required to make contributions to the fund pursuant to the terms of a multiemployer pension plan or a collective bargaining agreement is also required to do so as a matter of federal law. *See* 29 U.S.C. § 1145. This provision, in other words, "makes a federal obligation of an employer's contractual commitment to contribute to a multiemployer pension fund." *Flynn v. R.C. Tile*, 353 F.3d 953, 958 (D.C. Cir. 2004).

"By 2005, a confluence of economic circumstances . . . threatened ERISA's system for federally insuring multiemployer pension plans," *F.W. Honerkamp*, 692 F.3d at 130, and, in response, Congress enacted the Pension Protection Act of 2006 ("PPA"), Pub. L. No. 109-280, 120 Stat. 780. Among other things, the PPA requires that a multiemployer pension plan's actuary assess the financial health of the plan. 29 U.S.C. § 1085(b)(3)(A). If the plan fails to satisfy certain criteria, the actuary must certify the plan is in "endangered," "seriously endangered," or "critical status." *Id.* § 1085(b)(1)–(2). If a plan is in critical status, the plan

sponsor—here, the Fund—must "adopt and implement" a "rehabilitation plan," *id*. § 1085(a)(2),

"not later than 240 days following the required date [of] the actuarial certification," *id*.

§ 1085(e)(1).  After adopting a rehabilitation plan, the plan sponsor must "provide to the

bargaining parties [one] or more schedules showing revised benefit structures, revised

contribution structures, or both, which, if adopted, may reasonably be expected to enable the

multiemployer plan to emerge from critical status."  *Id*. § 1085(e)(1)(B).  One of the plan

sponsor's proposed schedules, moreover, must "be designated as the default schedule," which

"shall assume that there are no increases in contributions under the plan other than [those]

necessary to emerge from critical status after future benefit accruals and other benefits . . . have

been reduced to the maximum extent permitted by law."  *Id*. § 1085(e)(1).

Although the bargaining parties may agree which schedule to adopt in their collective

bargaining agreement, Congress also addressed how to proceed if the parties are unable to reach

an agreement.  Congress enacted the most recent iteration of these rules in the Multiemployer

Pension Reform Act of 2014 ("MPRA"), Pub. L. No. 113-235, Div. O, 128 Stat. 2130, 2773–

2822.  Under the law as it now stands, if a collective bargaining agreement is in place at the time

a plan enters critical status and then expires, and the parties are unable to reach agreement on a

contribution schedule, the employer will be required to make contributions pursuant to the

default schedule.  29 U.S.C. § 1085(e)(3)(C)(i).  In contrast, if a collective bargaining agreement

that embodies an agreed-upon schedule adopted pursuant to a rehabilitation plan "expires while

the plan is still in critical status," and the parties fail to reach agreement regarding a contribution

schedule going forward, "then the contribution schedule applicable under the expired collective

bargaining agreement, as updated and in effect on the date the collective bargain agreement

expires, shall be implemented by the plan sponsor," *id*. § 1085(e)(3)(C)(ii), beginning on "the

date which is 180 days afer the date on which the collective bargain agreement . . . expire[d]," *id.* § 1085(e)(3)(C)(iii).

## B.    Factual Background

Service Employees International Union Local 1199 United Health Care Workers East ("SEIU") has been the exclusive bargaining representative for two groups employed by Castle Hill: (1) certified nurse assistants and (2) dietary, housekeeping, and recreational aides. *See* Dkt. 15-2 at 2 (SUMF ¶¶ 3–4).[1]  Since 1992, a series of collective bargaining agreements between Castle Hill and SEIU have defined the terms and conditions of employment, including pension rights, of members of those groups. *Id.* (SUMF ¶ 4).  In 2002, Castle Hill and SEIU entered into a modified collective bargaining agreement that, among other changes, converted the previous pension plan to the current Fund, *id.*, which is an "employee benefit plan" and "a multiemployer plan" under ERISA.  Among other things, Castle Hill committed to comply with "the provisions of Agreement and Declaration of Trust ('Trust Agreement') establishing the Fund, as it may from time to time be amended, and [with] all resolutions and rules adopted by the Trustees pursuant to the powers delegated to them by the" collective bargaining agreement, "including collections policies."  Dkt. 15-4 at 9 (2002 CBA).  The Trust Agreement, in turn, authorizes the

---

[1]  Castle Hill declines to respond to many factual assertions contained in the Fund's statement of undisputed material fact on various grounds, positing, for example, that no response is required to "conclusions of law" or to descriptions of documents that are "incomplete" or that "speak for themselves." *See, e.g.*, Dkt. 21 at 2 (Response to SUMF ¶ 5) ("The first sentence of Paragraph 5 describes a 2010 memorandum of agreement, which is a document that speaks for itself. Plaintiffs' description[] of this document is incomplete as it does not fully describe the terms of the memorandum of agreement.").  In other instances, moreover, Castle Hill simply denies the fact without elaboration. *Id.* at 7 (Response to SUMF ¶ 35) ("As to the first sentence of Paragraph 35, denies, as stated. As to the second sentence of Paragraph 35, Castle Hill is without sufficient information to admit or deny.").  Because the non-moving party is obligated to respond to statements of fact that are supported by citations to record evidence with its own citations to record evidence, *see* Fed. R. Civ. P. 56(c)(1)(A); LCvR 7(h)(1), most of Castle Hill's efforts to controvert the Fund's statement of undisputed facts are ineffectual.

Fund to "establish such procedures, rules, and regulations . . . as shall be necessary to carry out the operation of the [Fund] and [to] effectuate the purpose thereof," Dkt. 15-6 at 6 (Trust Agreement), and, pursuant to this authority, the Fund adopted its Statement of Policy for Collection of Delinquent Contributions ("Collection Policy"), Dkt. 15-7 (Collection Policy).

As relevant here, the Trust Agreement and Collection Policy required Castle Hill to submit monthly contributions and remittance reports detailing its regular payments to the Fund, including information on hours paid, excluding overtime, for all eligible full-time and part-time employees or non-regular employees who have been continuously employed for at least one year. Dkt. 15-2 at 3 (SUMF ¶ 10); Dkt. 15-4 at 9 (2002 CBA). In the event of delinquent contributions or reports from Castle Hill, the Trust Agreement authorizes the Trustees to take action against Castle Hill, including by demanding payment for interest, liquidated damages, and attorneys' fees. Dkt. 15-6 at 3 (Trust Agreement); Dkt. 15-7 at 9 (Collection Policy). In particular, the Collection Policy calls for the collection of interest on delinquent contributions at the rate of 10% per year, Dkt. 15-7 at 9 (Collection Policy), and liquidated damages equal to the amount of either the interest due or 20% of the delinquent contribution, whichever is greater, *id.* The Collection Policy specifies that any "obligations to pay interest, liquidated damages and fees chargeable under this policy are contractual in nature and independent of the provisions of ERISA Section 502(g)." *Id.* at 10.

In 2009, the Fund fell into "critical status" as defined by the PPA, causing it to adopt and implement a rehabilitation plan. *See* 29 U.S.C. § 1085(a)(2). In November 2009, the Fund notified Castle Hill and others that it had entered critical status and that it had adopted a rehabilitation plan. Dkt. 15-9 at 2 (Rehabilitation Plan). Of particular relevance here, that notice explained that "[t]he Trustees are providing two schedules of contribution increases for the

bargaining parties to consider—a Preferred Schedule and a Default Schedule." *Id.* Under the Preferred Schedule, the bargaining parties could agree that Castle Hill would pay increased contributions in the amount of 10% of the underlying base contributions for 2010; 18.5% for 2011; 27.7% for 2012; 37.6% for 2013; 48.3% for 2014; 59.8% for 2015; 72.1% for 2016; 85.5% for 2017; and with escalating increases beyond 2017. Dkt. 15-9 at 14 (Rehabilitation Plan); Dkt. 15-10 at 5 (First Smith Decl. ¶ 21). Alternatively, under the Default Schedule, the parties could agree on rate increases of 21.3% for 2010; 33.7% for 2011; 47.4% for 2012; and 62.5% for years thereafter. Dkt. 15-9 at 14 (Rehabilitation Plan). As the notice further explained, "[i]f the bargaining [parties failed to] adopt a schedule and [to] provide notice of [their] agreement to the Fund . . . within 180 days of the termination of [their] last agreement, the . . . Trustees [would] impose the Default Schedule on" Castle Hill and SEIU. *Id.* at 12 (Rehabilitation Plan)

In March 2010, Castle Hill and SEIU entered into a Memorandum of Agreement ("MOA"), extending their collective bargain agreement under specified terms from April 1, 2010 through March 31, 2014. Dkt. 15-5 at 2–7 (MOA). Consistent with the Fund's rehabilitation plan notice, the parties agreed to the increased contribution rates set forth in the Preferred Schedule for the annual periods running from April 1, 2010, 2011, and 2012 to March 31 of each of the following years.[2] *Id.* at 3 (MOA). Although the term of the MOA ran until March 31, 2014, with respect to the final year of that term, the MOA merely provided: "The parties agree to

---

[2] The MOA provided that Castle Hill's contributions would increase to 2.2% per paid hour for all covered employees excluding overtime pay, uniform allowance, and unused sick leave payout in 2010, increasing annually to 2.37% per paid hour in 2011, then 2.55% per paid hour in 2012. Dkt. 1 at 4 (Compl. ¶ 11); Dkt. 17-3 at 3. These rates correspond with the base contributions of 2% increased according to the preferred schedule (*i.e.*, 2.2%—the rate for 2010—is a 10% increase on the prior year's rate of 2%; 2.37%—2011's rate—is an 18.5% increase on the prior year, and so on and so forth). *See* Dkt. 15-5 at 2; Dkt. 15-10 at 5−6 (First Smith Decl. ¶¶ 22−26).

re-open the contract for the purpose of negotiating pension fund contributions on or about September 1, 2012 for it to be effective April 1, 2013." *Id.* The parties met on multiple occasions in an effort to reach a new collective bargaining agreement after the expiration of the prior agreement, but they were unable to agree on new terms. Dkt. 17 at 5−6.

The Fund has remained in critical status to the present. *See* Dkt. 15-8 (Critical Status Notice). According to the Fund, however, from "October 2014 through April 2017, [Castle Hill] has failed to remit certain contractually required reports and contributions and has failed to pay certain interest charges, liquidated damages, and supplemental contributions due under the PPA to the . . . Fund." Dkt. 1 at 6–7 (Compl. ¶ 18). As a result, the Fund brought this suit in August, 2017, seeking a declaratory judgment that Castle Hill "is delinquent in remitting owed contributions, interest, liquidated damages, and PPA supplemental contributions . . . pursuant to the 2010 MOA," as well as "remittance reports for the months of May 2016, June 2016, and August 2016", and an order requiring Castle Hill "to pay the corresponding outstanding contributions, interest, liquidated damages, and PPA supplemental contributions for these delinquent months" as well as "unpaid contributions, interest, liquidated damages, and PPA supplemental contributions for the period of October 2014 through April 2017." Dkt. 1 at 9–10 (Compl.). The Fund also seeks a permanent injunction against Castle Hill, "requiring it to remit its reports and contributions to the Pension Fund in a timely manner." *Id.* Asserting that no disputed issues of material fact stand between it and the relief it seeks, the Fund seeks summary judgment. Dkt. 15.

## II. LEGAL STANDARD

A party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if it can "show[] that there is no genuine dispute as to any material fact and [that she] is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it could affect the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in her favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

# III. ANALYSIS

Under Section 515 of ERISA, "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. Moreover, "[i]n any action" brought under ERISA by the trustees of a plan to enforce Section 515, "the court shall award the plan . . . the unpaid contributions, . . . interest on the unpaid contributions, . . . liquidated damages[,] . . . reasonable attorney's fees and costs of the action[,] and . . . such other legal or equitable relief as the court deems appropriate." 29 U.S.C. § 1132(g). According to the Fund, this is such a case, and, as a result, it is entitled to $37,193.87 in unpaid contributions because Castle Hill applied the incorrect supplemental contribution rates, along with $10,865.65 in liquidated damages, $5,280.73 in interest to date, and attorneys' fees and costs. Dkt. 22-1 at 4–5 (Second Smith Decl. ¶¶ 16–17); *id.* at 6–7 (schedules of amount due). It also contends that it is entitled to declaratory and injunctive relief to ensure that Castle Hill complies with its continuing obligations under ERISA and the plan.

Castle Hill takes issue with each of these contentions. First, and most significantly, it contends that it complied with its obligations under ERISA and the plan by paying all required contributions. Second, it contends that in the event some additional amount may be due, the Fund has failed to carry its burden on summary judgment of demonstrating the absence of a genuine issue of material fact regarding that amount. Finally, it contends that injunctive relief is unwarranted because the Fund has failed to demonstrate that it will suffer irreparable injury in the absence of injunctive relief and has failed to show that it otherwise lacks an adequate legal remedy. The Court will consider each issue in turn.

**A.     Castle Hill's Obligation to Make Supplemental Contributions**

The parties agree that because the Plan is in critical status, Castle Hill is required to make supplemental contributions.  They differ, however, about the applicable rate.  According to the Fund, the bargaining parties agreed in the 2010 MOA to adopt the Preferred Schedule and, because the bargaining parties have not agreed to different terms, Castle Hill has remained bound to comply with that schedule from 2010 to the present.  Castle Hill sees it differently.  In its view, the 2010 MOA merely set the supplemental contribution rates for the annual periods beginning April 1, 2010, April 1, 2011, and April 1, 2012.  When it came to the final annual period covered by the 2010 MOA—April 1, 2013 through March 31, 2014—however, the bargaining parties merely agreed to negotiate regarding the supplemental contribution rate.  Although Castle Hill's argument is cursory, it appears to contend that because that negotiation proved unsuccessful, and because the bargaining parties have yet to reach an agreement, ERISA and the plan merely require that it continue to make supplemental contributions at the rate agreed upon for the April 1, 2012 period—that is, the last negotiated rate.

But for one complication, the Fund would win, without significant qualification.  Under the PPA, the Fund was required to present the bargaining parties with options for restoring the financial viability of the Fund as part of the rehabilitation plan, including a default schedule.  29 U.S.C. § 1085(e)(3).  It did so, notifying the parties of their option of adopting either the Preferred Schedule, which included lower supplemental contributions in the early years, followed by increases through 2023, or the Default Schedule, which included larger supplemental contributions in the early years but capped those increases for 2013 through 2023.  Dkt. 15-9 at 14 (Rehabilitation Plan).  At the time the bargaining parties entered into the 2010 MOA, they had the option of adopting "a contribution schedule with terms consistent with the

rehabilitation plan," but, if they failed to do so, the "plan sponsor" was required by statute to implement the Default Schedule. *See* 29 U.S.C. § 1085(e)(3)(C). Although Castle Hill argues to the contrary, the 2010 MOA leaves little doubt that the bargaining parties opted to adopt the Preferred Schedule; the rates the parties agreed to for each of the first three years of the term of the 2010 MOA exactly match the rates set forth for those years in the Preferred Schedule. The Court, accordingly, has little trouble concluding that the bargaining parties agreed to adopt the Preferred Schedule, at least for the first three years of the term of the 2010 MOA.

Assuming that the Preferred Schedule remained in effect throughout the term of the 2010 MOA, moreover, the Court could readily conclude that the Preferred Schedule continued to apply throughout the period at issue in this litigation. The parties agree that the 2010 MOA expired on March 31, 2014 and that Castle Hill and SEIU have yet to reach a successor agreement. *See* Dkt. 22 at 9. As a result, this is a case in which the bargaining parties had reached an agreement that provided for supplemental payments (at least through March 31, 2013), but that agreement expired while the Plan was still in critical status.

The MPRA speaks directly to this issue. It provides:

If—

(I)   a collective bargaining agreement providing for contributions under a multiemployer plan in accordance with a schedule provided by the plan sponsor pursuant to a rehabilitation plan (or imposed [under the default-schedule rule])] expires while the plan is still in critical status, and

(II)  after receiving one or more updated schedules from the plan sponsor under [the provision requiring annual updates "to reflect the experience of the plan"], the bargaining parties with respect to such agreement fail to adopt a contribution schedule with terms consistent with the updated rehabilitation plan and a schedule from the plan sponsor,

then the contribution schedule applicable under the expired collective bargaining agreement, as updated and in effect on the date the collective bargaining

agreement expires, shall be implemented by the plan sponsor beginning on that date specified in clause (iii).

29 U.S.C. § 1085(e)(3)(C)(ii). Clause (iii), then, provides that the prior contribution schedule shall be implemented "180 days after the date on which the collective bargaining agreement . . . expire[d]." *Id.* § 1085(e)(3)(C)(iii).

As explained below, the Court is unable, on the existing record, to determine how this provision applies to the bargaining parties' agreement prior to January 1, 2015—an uncertainty that, at this stage of the proceedings, precludes the Court from entering summary judgment in favor of the Fund for that time period. The Court is satisfied, however, that the Fund has carried its burden as to Castle Hill's failure to comply with its obligations under both the MPRA and the plan for the period following that date, although the specific amount due remains in question.

    1.    *Period Prior to January 1, 2015*

Applying the MPRA, the 2010 MOA expired on March 31, 2014, Dkt. 15-5 at 2 (MOA), and thus the 180 days would have run on September 27, 2014. But because the relevant portions of the MPRA had an implementation date of December 31, 2014, *see* 26 U.S.C. § 432 note, the changes made by the MPRA could not apply to any "plan year[]" before January 1, 2015, *id.* As a result, had the bargaining parties agreed (and they may have done so) that the Preferred Schedule applied until the termination of the 2010 MOA on March 31, 2014, the Court could conclude that Castle Hill was required to make supplemental payments under that schedule— first under the terms of the MOA and then, starting January 1, 2015, pursuant to the MPRA. *See Serv. Emps. Int. Union Nat. Indus. Pension Fund v. Jersey City Healthcare Providers, LLC*, 2019 WL 591562, at *6 (D.D.C. Feb. 13, 2019). Under the Fund's reading of the law, and its view of the facts, this would mean that (1) Castle Hill's supplemental contribution rate would have continued to climb during the lifespan of the 2010 MOA until it reached 37.6% of the

contribution rate during the last year of the term—from April 1, 2013 until March 31, 2014; (2) that the rate would have held at 37.6% until the MPRA became effective on January 1, 2015; and (3) that the rate would have then continued to climb as specified in the Preferred Schedule. Dkt. 22-1 at 3 (Second Smith Decl. ¶ 14).

The problem with this explication, however, is that the 2010 MOA left the contribution rate for the final year of its term—from April 1, 2013 through March 31, 2014—unresolved. According to the Fund, this is irrelevant. At the time the bargaining parties entered the 2010 MOA, they had a choice: They could either agree to incorporate one of the two schedules included in the Fund's rehabilitation plan in their agreement, or, if they failed to do so, the Default Schedule would apply. Understood in this light, the Fund maintains, the inclusion of the Preferred Schedule supplemental contribution rates for the first three years of the MOA's term can mean only one thing—the bargaining parties agreed to adopt the Preferred Schedule for the full term of the agreement. *See, e.g.*, Dkt. 15-2 at 6 (SUMF ¶ 26) ("Although the 2010 MOA does not restate the rates at which PPA surcharges and supplemental contributions are due for years after 2012, Castle Hill elected the preferred schedule.").

That may be right, but nothing contained in the Fund's—or Castle Hill's—briefing and evidence explains what the bargaining parties thought they were doing when they did not adopt a supplemental contribution rate for the last year of the MOA and, instead, "agree[d] to re-open the contract for the purpose of negotiating pension fund contributions . . . to be effective April 1, 2013." Dkt. 15-5 at 3. It may be that—as a matter of law—the bargaining parties had no choice, once they adopted the Preferred Schedule for the first three years of the term, but to adopt the same schedule for the final year of the MOA. But, if that is so, the Fund has failed to identify the

statutory provision or term of the Trust Agreement that supports that conclusion.[3]  Or it may be

that—as a matter of fact—the bargaining parties adopted the Preferred Schedule for all four

years that the MOA was in effect, subject only to an affirmative agreement to adopt a different

schedule.  But the Court cannot conclude, at least on the present record, that the Fund has shown

that the undisputed evidence supports that reading of the MOA.  The Fund is, of course, correct

that once a moving party carries its burden of citing record evidence showing that it is entitled to

prevail as a matter of law, the nonmoving party must respond with its own evidence "showing

that the materials cited do not establish the absence . . . of a genuine dispute," Fed. R. Civ. P.

56(c)(1)(B), and it is safe to say that Castle Hill has not come forward with any competent

evidence beyond the language of the 2010 MOA itself.  But before Castle Hill can be faulted for

failing to respond to the Fund's showing, the Fund must offer its own evidence.  Like Castle Hill,

however, the Fund also fails to identify any competent evidence addressing this issue beyond the

language of the MOA.

The Court, accordingly, is left with either (1) a disputed question of law regarding the

legally compelled consequences of the bargaining parties' agreement to incorporate the Preferred

Schedule for only the first three years of the four-year term of the MOA, or (2) a disputed issue

of fact regarding what rate the bargaining parties intended to govern the final year of the MOA

absent a successful renegotiation.  Either way, the Court lacks sufficient basis to enter summary

judgment on the present record.

---

[3]  29 U.S.C. § 1085(e)(3)(B)(iii) does provide that "[a] schedule of contribution rates provided by
the plan sponsor and relied upon by the bargaining parties in negotiating a collective bargaining
agreement shall remain in effect for the duration of that collective bargaining agreement," but it
is not clear that this provision applies in the present context and, in any event, the Court is not
prepared to construe and apply the provision in the first instance, without any briefing from the
parties.

Perhaps recognizing this problem, the Fund points to *Service Employees International Union National Industrial Pension Fund v. Castle Hill Health Care Providers, LLC*, 312 F.R.D. 678 (D.D.C. 2015) ("*Castle Hill I*"), which, according to the Fund, establishes that Castle Hill was bound "to pay the increased rate of 37.6%"—that is, the Preferred Schedule rate—"as of April 2013"—that is, as of the final year that the 2010 MOA was in effect. Dkt. 22 at 8–9. To the extent the Fund means to argue that Castle Hill is now precluded from disputing that the Preferred Schedule rate applied "as of April 2013," the Court is unpersuaded. "The doctrine of issue preclusion, or collateral estoppel, 'bars successive litigation of "an issue of fact or law" that "[was] actually litigated and determined by a valid and final judgment, and [that was] essential to the judgment."'" *Lavergne v. United States House of Representatives*, 2018 WL 4286404, at *5 (D.D.C. Sept. 6, 2018) (three-judge court) (alterations in original) (quoting *Bobby v. Bies*, 556 U.S. 825, 834 (2009)). To invoke the doctrine, the moving party must show that (1) "the same issue now being raised [was] contested by the parties and submitted for judicial determination in the prior case;" (2) "the issue [was] actually and necessarily determined by a court of competent jurisdiction in that prior case;" and (3) "preclusion in the second case [will] not work a basic unfairness to the party bound by the first determination." *Martin v. Dep't of Justice*, 488 F.3d 446, 454 (D.C. Cir. 2007) (quoting *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992)).

The portion of the *Castle Hill I* decision that the Fund relies on occupies only two sentences in the background section of the opinion. 312 F.R.D. at 680. The decision, moreover, does not treat the issue as contested, nor was there any basis to do so in that case. To be sure, Castle Hill only barely raises the issue here, but it has done more than it did in *Castle Hill I*. Here, for example, Castle Hill offers a declaration attesting that the 2010 MOA was "not open

ended and set[] forth specific rates of pay and contributions" and that "[t]he [bargaining] parties were unable to reach a new agreement memorializing economic terms including the increased contributions to the Pension Fund." Dkt. 17-2 at 2 (Jasinski Decl. ¶¶ 4, 9). Castle Hill also provided the Court with a copy of the 2010 MOA, which contains the reservation with respect to the final year of the agreement. Dkt 17-3 at 3 (MOA). Although far from pellucid, the Court understands Castle Hill to contend that the MOA did not adopt the Preferred Schedule for all years, but rather adopted the Preferred Schedule rates for the first three years, while leaving the fourth year undecided. In *Castle Hill I*, in contrast, Castle Hill did not even allude to the different treatment that the MOA accorded to the final year. Based on a review of the record in that case, and the *Castle Hill I* opinion, it is evident that no question respecting the distinct treatment of the period starting on April 1, 2013, was contested. As a result, the doctrine of issue preclusion does not compel the conclusion that the bargaining parties adopted the Preferred Schedule for all four years that the MOA was in effect.

It bears emphasis that the Fund might well be right and, for either legal or factual reasons, the Court will eventually conclude that the bargaining parties adopted the Preferred Schedule for all four years. But, in light of the existing factual record and the briefs that the parties have submitted, the Court cannot resolve that question with the confidence necessary to enter summary judgment. Nor are the consequences of that uncertainty resolved—or even addressed—by the existing record. What rate, for example, would apply for the period from April 1, 2013 through March 31, 2014, if the Court were to conclude that the bargaining parties agreed only that the Preferred Schedule would govern for the first three years of the MOA? What rate would then apply from the period from March 31, 2014 until the MPRA took effect on January 1, 2015? Without answers to these questions, the Court cannot definitively resolve the

Fund's claim for past-due supplemental contributions, liquidated damages, and interest for the period prior to January 1, 2015.

The Court, accordingly, denies the Fund's motion for summary judgment without prejudice for the period preceding January 1, 2015.

2.      *Period After January 1, 2015*

These questions do not persist, however, for the period after January 1, 2015. As explained above, the MPRA provides in clear terms that, if the bargaining parties adopt a contribution schedule in a collective bargaining agreement and that agreement "expires while the plan is still in critical status," and if the bargaining parties are unable agree on a contribution schedule going forward, the "schedule applicable under the expired collective bargaining agreement" shall go into effect 180 days after the collective bargaining agreement expired. 29 U.S.C. § 1085(e)(3)(C)(ii) & (iii). Here, under any plausible understanding of the relevant events, the last contribution schedule to which the bargaining parties agreed was the Preferred Schedule. The bargaining parties had the option of adopting that schedule or the Default Schedule. *See* Dkt. 15-9 at 14 (Rehabilitation Plan). Neither the Fund nor Castle Hill even suggests that the bargaining parties adopted the Default Schedule, leaving one option. And that option, in fact, mirrors the precise terms of the 2010 MOA for the first three years. The fact that the MOA does not use the phrase "Preferred Schedule" is of no moment.

As a result, whether the 2010 MOA expired on April 1, 2014 or—for relevant purposes— on April 1, 2013, when the bargaining parties failed to reach agreement on a supplemental contribution rate for the final year, the last agreed-upon schedule was the Preferred Schedule, and under the MPRA, the Fund was required to implement that schedule on the first day the

MPRA took effect. Those rates required the payment of supplemental contributions equal to 48.3% of the agreed-upon contribution rate for 2015; 59.8% for 2016; and 72.1% for 2017. *Id.*

The Court, accordingly, grants summary judgment in favor of the Fund for the period commencing on January 1, 2015, subject to the qualification set forth in the next section of this opinion.

## B.    Amounts Owed

That leaves, then, the specific amount that Castle Hill owes for 2015–2017. Castle Hill argues that, even if it is liable for unpaid contributions, "genuine issues of fact remain such as to preclude summary judgment" with respect to the exact amount of damages. Dkt. 17 at 7. In particular, it argues that summary judgment is inappropriate because "some sort of reasonable basis must be present that would allow a determination of the amount of damages" and "[h]ere, such a basis does not exist." *Id.* at 8. Castle Hill is correct that the Fund bears the burden of proving the amounts claimed. With two exceptions discussed below, however, it is incorrect that the Fund has failed to carry this burden.

Along with its declarations, the Fund has submitted detailed spreadsheets describing the amounts owed and appropriate interest based on the undisputed terms of the bargaining agreement. *See* Dkt. 22-1 at 6−7 (Second Smith Decl.). Castle Hill argues that "none of the documents produced by [the Fund] indicate what eligibility criteria the . . . Fund applied when determining whether Castle Hill paid the requisite contribution amounts for a given month." Dkt. 17 at 9. In support of this contention, Castle Hill relies on *Service Employees International Union National Industry Pension Fund v. Hamilton Park Health Care*, a case in which spreadsheets submitted by the plaintiffs "left the Court sufficiently skeptical of the Fund's numbers that it [wa]s unwilling . . . to enter judgment for the amount the Fund request[ed]." No.

14-84, 2016 WL 183505, at *2 (D.D.C. Jan. 14, 2016). Castle Hill contends that case concerned "the same types of documents relied upon here." Dkt. 17 at 9.

The fact that this case and *Hamilton Park* both involve the use of spreadsheets does not, of course, mean that *Hamilton Park* controls, and, indeed, *Hamilton Park* is inapposite. As the Fund stresses, *Hamilton Park* starts with a caution that its holding is limited to the "the narrow, fact-intensive, and case-specific" circumstances at issue in that matter. 2016 WL 183505, at *1. That caution was premised on the fact that the *Hamilton Park* plaintiffs had submitted spreadsheets—as opposed to any other type of evidence—and that the spreadsheets suffered from numerous, dispositive, flaws. *See id*. at *2–*4 (describing how "[n]one of the columns add up to any of" the totals; how it was not "obvious how the total of any column even relates to any" claim for damages; and how "it appear[ed] that the Fund [was] not using a consistent formula for the amounts" within a specific column).

Here, in contrast, the Fund's evidence is more substantial, and Castle Hill has failed to identify any flaws in that evidence. In support of its claims, the Fund offers two declarations from Kisha Smith, a Contribution Compliance Manager employed by the Fund. Dkt. 15-10 at 1 (First Smith Decl.); Dkt 22-1 at 1 (Second Smith Decl.). In her first declaration, Smith explains that she reviewed Castle Hill's account, "including the remittance reports that [Castle Hill] has provided to the Fund, the contributions that [it] has remitted to the Fund, the dates on which [those] reports and contributions were received, and the interest and liquidated damages that were assessed." Dkt. 15-10 at 6–7 (First Smith Decl. ¶ 27). She then explains the data set forth in two attached spreadsheets and affirms that the data "comes directly from Castle Hill's own reporting, as well as the collectively bargained rates for contributions, interest, and liquidated damages." *Id*. at 7 (First Smith Decl. ¶ 29). The methodology for calculating the amount due for

contributions, which she explains, is not complicated: she merely multiplied the "'hours reported,' which is the total gross monthly earnings of all covered employees as reported by the employer, by the 'rate,' which is the contractually agreed upon rate between the employer and the union.'" *Id.* (First Smith Decl. ¶ 30). Finally, Smith offers similar explanations for the remaining columns included in the spreadsheets, including the columns for interest and liquidated damages. *Id.* at 8–10 (First Smith Decl. ¶¶ 31–36). That methodology is also apparent from a review of the spreadsheets themselves.

That said, discrepancies between the first and second set of spreadsheets raise two questions that neither Smith nor any other witness addresses. The second Smith declaration and the accompanying spreadsheets follow a similar approach to the first, but modified in light of the Fund's recognition that the 2010 MOA expired on April 1, 2014, and was not renewed. Dkt. 22-1 at 6–7 (Second Smith Decl.). Some of the changes that Smith made relate to the period prior to January 1, 2015, which is discussed above. But she also changed the start and end dates for each applicable year; whereas each relevant year runs from April 1 to March 31 in her first set of calculations, Dkt. 15-10 at 12–13 (First Smith Decl.), each year runs from January 1 to December 31 in the second, Dkt. 22-1 at 6–7 (Second Smith Decl.). Moreover, under the first set of spreadsheets, the supplemental rate for each year corresponds with the rates set forth in the Preferred Schedule; for example, the rate for 2015 under the Preferred Schedule is 59.8%, and the rate reflected on the first set of spreadsheets for April 1, 2015 through March 31, 2016 is 59.8%. *Compare* Dkt. 15-9 at 14 (Rehabilitation Plan), *with* Dkt. 15-10 at 12–13 (First Smith Decl.). Under the revised tables, however, the rate for January 1, 2015 through December 31, 2015 is 48.3%, and that rate does not adjust to the 59.8% rate for 2015, as reflected on the

Preferred Schedule, until January 1, 2016. *Compare* Dkt. 15-9 at 14 (Rehabilitation Plan), *with* Dkt. 22-1 at 6–7 (Second Smith Decl.).

Because the second Smith declaration does not explain why the Fund made these changes, the Court cannot enter judgment—even for the post-January 1, 2015 period—without further explanation.  It may be that the changes are a product of the MPRA's effective date, but the Court is not inclined to speculate about why the second set of spreadsheets differ from the first set in these two respects.

The Court will, accordingly, again deny the Fund's motion for summary judgment without prejudice, and will allow the Fund to submit further declarations explaining how it determined the relevant periods for purposes of then applying the Preferred Schedule rates.

## C.     Injunctive Relief

Finally, the Fund also seeks a permanent injunction "requiring [Castle Hill] to remit its reports and contributions to the . . . Fund in a timely manner."  Dkt. 1 at 10 (Compl.); *see also* Dkt. 22 at 20.  According to the Fund, a permanent injunction is necessary because Castle Hill "has shown an utter disregard for this Court's orders."  Dkt. 22 at 21.  The Fund argues, for example, that "[d]espite decisions and/or judgments . . . entered against [Castle Hill] in December 2015, April 2016, [and] January 2017 by this Court, [Castle Hill] has failed to remit the $70,099.52 due to the Pension Fund for prior amounts due pursuant to judgment. "  *Id.* Castle Hill, for its part, responds to the Fund's request in less than a page, arguing that the Fund has "offer[ed] nothing more than speculation about future monetary damages in support of their request" and "cite to inapposite case law in furtherance of their application."  Dkt. 17 at 10.

Although ERISA does authorize a court to award "such other legal or equitable relief as the court deems appropriate," 29 U.S.C. § 1132(g)(2)(E), the Court concludes that it is premature to consider the entry of injunctive relief.  Although it appears that additional contributions are

due, the amount of those contributions and the associated interest and liquidated damages remains unsettled. Until the Court can ascertain the amount that Castle Hill owes, it is premature to issue an injunction compelling the company to make those payments.

## CONCLUSION

Plaintiffs' motion for summary judgment, Dkt. 15, is hereby **GRANTED** in part and **DENIED** in part without prejudice. It is **ORDERED** that the parties shall appear for a status conference on May 13, 2019 at 11:00 a.m. in Courtroom 21.

**SO ORDERED.**


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date: March 30, 2019