# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JENNIFER HAMEN, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 16-1394 (RDM) |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | |
| *Defendants*. | |

## MEMORANDUM OPINION

In October 2015, Mark McAlister and John Hamen, private contractors sent to assist in the renovation of a hotel in Yemen used to house United Nations personnel, were abducted from the airport in Sana'a, Yemen. Dkt. 57 at 1. This abduction was carried out by members of Yemeni militant group known as the Houthis. *Id.* The Houthis murdered Hamen sixteen days later and held McAlister as a hostage for over six months. *Id.* at 1, 17. In the aftermath of this tragedy, Plaintiffs Mark McAlister, the estate of John Hamen, and eleven of their family members, brought this action against the Islamic Republic of Iran ("Iran") for "provi[ding] material military and economic support" to the Houthis, alleging that the violence the Houthis inflicted on McAlister and Hamen was "an expected and welcomed result of such support." Dkt. 1 at 17–18 (Compl. ¶¶ 94, 106). Iran was duly served yet failed to respond to the complaint or otherwise to appear. *See* Dkt. 57 at 1.

To establish subject-matter jurisdiction, Plaintiffs invoked the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(a). Dkt. 1 at

1

3. And, for a cause of action, Plaintiffs relied on § 1605A(c), alleging that Iran provided "material support" to the Houthis, which used that support to engage in acts of extrajudicial killing, hostage taking, and torture. Dkt. 1 at 18 (citing 28 U.S.C. § 1605A(c)). On August 7, 2019, the Court issued a decision finding that (1) the Houthis "committed 'hostage taking' . . . with respect to McAlister" and "committed an extrajudicial killing of Hamen," Dkt. 57 at 26; (2) "Iran provided 'material support or resources' to the Houthi militants in the form of weapons, financial support, and training, both directly and indirectly through Hezbollah," *id.*; and (3) "this support 'caused' the hostage-taking of McAlister and extrajudicial killing of Hamen," *id.* at 31. Based on these findings, the Court held that it had subject-matter jurisdiction over Plaintiffs' claims, *see id.* (citing 28 U.S.C. §§ 1330(a), 1605A(a)(1)), and that Iran was liable for Plaintiffs' injuries and losses, *id.* at 32. The Court, accordingly, granted Plaintiffs' motion for entry of default judgment against Iran. Dkt. 58.

For assistance in evaluating Plaintiffs' damages, the Court referred the case to a special master, Deborah Greenspan, to prepare a report and recommendations regarding compensatory, but not punitive, damages. *See* Dkt. 59 (Order Appointing Special Master). The Special Master has now filed her report and recommendations. *See* Dkt. 60 (Special Master Report). In preparing the report, the Special Master reviewed sworn testimony, video depositions, medical records and autopsies, and expert reports, all of which have been filed with this Court. *See* Dkt. 32–52. The report lays out the effects that the abduction, hostage taking, and murder had on the family members of Mark McAlister and John Hamen, and carefully analyzes Plaintiffs' claims for damages under the applicable framework for state-sponsored terrorism cases. The Court thanks the Special Master for her excellent and expeditious assistance.

As explained below, the Court adopts the Special Master's proposed findings and recommendations, subject to the modifications set forth below.

**ANALYSIS**

As an initial matter, the Court agrees with, and adopts without modification, the Special Master's findings of fact, all of which are well explained and amply supported by the record. Tracking the Special Master's report, the Court will first review her conclusions with respect to the economic and non-economic damages that those findings support and will then turn to the question of punitive damages, which is not addressed in the Special Master's report.

**A.     Economic Damages**

"Section 1605A explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 48 (D.D.C. 2016) (citing 28 U.S.C. § 1605A(c)).  Traditionally, plaintiffs may prove economic losses by the submission of a forensic economist's expert report.  *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015).  When evaluating an expert's calculations, the Court must consider the "reasonableness and foundation of the assumptions relied upon by the expert."  *Id.* at 402 (citing *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012)).

The Estate of John Hamen seeks to recover the loss of income and benefits stemming from Hamen's murder.  In support of this claim, the Estate submits the affidavit and testimony of economist Dr. James V. Koch, a Visitors' Professor of Economics and President Emeritus at Old Dominion University in Norfolk, Virginia.  Dkt. 32-6.  As the Special Master observes, Dr. Koch was a professor of economics at several universities, has received numerous honorary degrees,

published numerous books and articles on economics, and served as a consultant or expert witness on behalf of numerous law firms and other organizations for various matters. *See* Dkt. 60 at 18–19 (citing March 5, 2018 Expert Affidavit of James V. Koch, ("Koch Affidavit"), Dkt. 32-6 at ¶¶ 1–2 and Exh. A (curriculum vitae)); *see also Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 55–56 (D.D.C. 2018) (adopting Dr. Koch's economic loss calculations in a Section 1650A(c) case). In the view of the Special Master, Dr. Koch is qualified as an expert for the purpose of determining economic loss. Dkt. 60 at 19. The Court agrees.

Moving to Dr. Koch's findings, the Special Master found that his assumptions were "reasonable," that his methods were "consistent with generally accepted practices," and that he "appl[ied] appropriate assumptions based on reasonable and well-documented sources." *Id.* at 20. Accordingly, the Special Master recommends that the Court adopt Dr. Koch's proposal as the award of economic loss for the Estate of John Hamen. *Id.* The Court adopts his recommendations and will award economic loss damages to the Estate of John Hamen in the amount of $2,769,948.

**B.     Non-Economic Damages**

1.     *Pain and Suffering for Mark McAlister*

Plaintiff McAlister seeks $10,000 in damages to compensate for the pain and suffering he suffered each day he was held captive, for a total amount of $1,920,000.[1] Dkt. 29 at 19. Placing

---

[1] Although both the Court's Memorandum Opinion (liability decision) and the Special Master's report state that McAlister was held captive for six months and eleven days, the record reflects that he was held for six months and *nine* days, from October 20, 2015 to April 29, 2016. *See* Dkt. 29 at 13 (Am. Compl. ¶ 75) ("Mark McAlister was released into United States government custody on April 29, 2016."); *see also* Timeanddate.com, available at: https://www.timeanddate.com/date/durationresult.html?m1=10&d1=20&y1=2015&m2=4&d2=29&y2=2016 (192

4

a dollar amount on the kind of harm suffered by McAlister "can be difficult." *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 70 (D.D.C. 2015) (internal quotes and citation omitted). There is no market, economic study, or scientific analysis that the Court can employ. Courts do find significant guidance, however, in the principle that "individuals with similar injuries receive similar awards." *See, e.g.*, *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 48 (D.D.C. 2012) (internal quotations omitted). With that principle in mind, McAlister's claim of $10,000 per day is well-founded: a "$10,000 per day of captivity has evolved in this [d]istrict as a general standard for cases of prolonged and abusive unlawful detention brought under the FSIA." *Azadeh v. Gov't of the Islamic Republic of Iran*, No. 16-1467, 2018 WL 4232913, at *18 (D.D.C. 2018); *see also Moradi*, 77 F. Supp. 3d at 70 (collecting cases). Given that McAlister's prolonged and abusive detention is comparable to that of other victims where the $10,000 per day rate has been used, *see, e.g.*, *Azadeh*, 2018 WL 4232913, at *11 ($10,000 rate where plaintiff "was confined to a small cell lacking adequate light and toilet facilities, and was left with nothing on which to sleep except an insect-infested rug"), the Court finds that $1,920,000 constitutes a reasonable estimate of the pain and suffering McAlister endured over the course of his 192 days as a hostage.

For the post-detention period, McAlister seeks damages of $5 million. Dkt. 29 at 20. As the Special Master explains, a line of cases has developed addressing similar claims for post-release pain and suffering. *See* Dkt. 60 at 22 (citing *Hekmati v. Islamic Republic of Iran*, 278 F.Supp.3d 145,164 (D.D.C. 2017); *Azadeh*, 2018 WL 4232913, at *19–20; *Moradi,* 77 F. Supp.

---

days, or six months and nine days). This difference is of no import, however, as the cumulative day count remains the same: 192.

3d at 69–70; *Massie v. Gov't of Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 77 (D.D.C. 2008); *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 135-36 (D.D.C. 2006)). In these cases, courts have recognized that "the $10,000 per diem formula will not always adequately compensate plaintiffs for the future pain and suffering they are likely to endure as a result of their detention and torture." *Azadeh*, 2018 WL 4232913, at *19. In such cases, courts have considered it appropriate to "award a post-release amount that reflects the length and severity of the plaintiff's detention and torture, the extent of the plaintiff's lasting physical and mental injuries, and the estimated number of years that the plaintiff can be expected to suffer from these injuries." *Id.*

As with McAlister's damages for the period he was in captivity, the guiding principle for compensating McAlister for his post-release pain and suffering is that "individuals with similar injuries receive similar awards." *Moradi*, 77 F. Supp. 3d at 70 (internal quotations and citations omitted). In this respect, the Special Master concluded that this court's decision in *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57 (D.D.C. 2015), is particularly helpful, and the Court agrees. The factors relevant to assessing post-release pain and suffering in this case—duration and severity of detention, scope of the post-release injuries, and age of the victim—are similar to the factors underlying the *Moradi* decision. As a result, the Special Master recommends that McAlister be awarded the same relief as the plaintiff in *Moradi*—a lump sum of $5 million to compensate for post-relief pain and suffering. Dkt. 60 at 23. The Court agrees and will, accordingly, award $5 million in damages for McAlister's post-release pain and suffering.

2. *Pain and Suffering for John Hamen*

The Estate of John Hamen seeks $5 million in pain and suffering damages for the abuse and torture he endured during his 16 days in captivity and for the period immediately prior to his death. *See* Dkt. 32 at 22. In light of the painful injuries Hamen suffered while in captivity, and the "gruesome and violent" manner in which he was murdered, the Special Master recommends that the Court award $6 million for Hamen's pain and suffering. Dkt. 60 at 25–26. Although the Court agrees that Hamen was brutally murdered and that his pain and suffering warrants enhanced compensation, the Court concludes that the $5 million that Plaintiffs seek already includes a substantial upward adjustment and, accordingly, will award that amount.

This court has repeatedly recognized that the fear and distress caused by knowing that one's death is imminent is a reasonable component of damages, as is the physical pain associated with a brutal murder. *See* Dkt. 60 at 24 (citing *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 81–82 (D.D.C. 2011); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 221, 266–73 (D.D.C. 2008); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5, 8 (D.D.C. 2000); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112–13 (D.D.C. 2000)). It is less clear, however, how best to measure that extraordinary form of injury. In a case in which the victim survives a terrorist attack but sustains substantial injuries, courts typically apply a "baseline assumption" that the victim is entitled to $5 million in compensation for pain and suffering, although that number is subject to upward or downward adjustment. *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 37-38 (D.D.C. 2012). But that baseline amount does not apply here because it typically includes a component for pain and

suffering or "'impairment that will remain with the victim for the rest of his or her life.'" *Id.* at 37 (citation omitted).

In contrast, where, as here, the victim does not live for a significant period of time after the attack, the relevant starting place is often lower than $5 million. Courts have, for example, calculated pain and suffering by awarding $10,000 for each day the victim was held captive plus an additional $1,000,000 for the anguish the victim endured while facing imminent death. *See, e.g.*, *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 269 (D.D.C. 2002); *see also Azadeh*, 2018 WL 4232913, *18–19 (using a per diem *plus* approach where the victim was abducted and experienced the pain of facing imminent death). Where the period of suffering lasts longer than a few minutes and where the victim is subject to extraordinarily cruel and painful treatment, however, this court has awarded much larger, lump sum amounts. *See, e.g.*, *Foley v. Syrian Arab Republic*, 281 F. Supp. 3d 153, 157 (D.D.C. 2017) (awarding the estate $30 million for pain and suffering where victim was "subjected to various blunt force injuries, strangulation, and the removal of his eyes and tongue before his death"); *Wultz*, 864 F. Supp. 2d at 31, 38 (awarding $8 million to victim who "suffered from severe bleeding caused by multiple shrapnel wounds, acute respiratory distress, a perforated bowel, multiple infections, . . . acute renal failure, hemorrhagic and septic shock, among other injuries" before dying "nearly one month" after the attack). Moreover, where a victim suffered brutal treatment over a relatively brief period of confinement, this court has, at times, applied a lump sum approach, without a per diem component. *See*, *e.g.*, *Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 234 (D.D.C. 2002), *abrogated on other grounds by Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004).

Following the lead of these decisions, the Court concludes that the Estate of John Hamen is entitled to a substantial upward adjustment from the $1 million payment for pain and suffering "typically" awarded in cases involving victims "who survive[] a few minutes to a few hours after" a terrorist attack. *Wultz*, 864 F. Supp. 2d at 38. Here, there is evidence that Hamen was severely beaten while he was in captivity and that he was murdered in a particularly cruel and inhumane manner, which undoubtedly caused him to suffer severe pain and terror. As a result, a per diem approach substantially understates his suffering, as does the $1 million benchmark applied in cases in which a terrorist attack, such as a bombing, results in a relatively quick, albeit painful, death. Although not precisely on all fours, this case is similar to *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54 (D.D.C. 2018), where this Court awarded $5 million in compensation for pain and suffering to soldiers who were shot, beaten, and ultimately murdered over a short period of time. As in *Fritz*, the Court finds that an award of $5 million in pain and suffering damages to the estate of the decedent strikes the proper balance.

3. *Solatium for Family Members*

"Solatium claims are typically brought by family members who were not present or injured themselves." *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017) ("*Cohen I*"). An award of solatium damages is intended to compensate for "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009). The state-sponsored terrorism exception to the FSIA expressly contemplates the award of solatium damages to the close relatives of terrorism victims. *See* 28 U.S.C. § 1605A(c). As the Special Master notes, there

exists a "'presumption' that family members in direct lineal relationship 'suffer compensable mental anguish and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages.'" *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 38 (D.D.C. 2016) (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)) (internal alterations omitted).

"Solatium damages, like damages for pain and suffering, are by their very nature unquantifiable." *Moradi*, 77 F. Supp. 3d at 72. But, as with the latter, courts have identified certain baselines that help ensure that similarly situated victims receive comparable awards. Specifically, courts in this district have followed the framework set out in *Heiser I*, which concluded that "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse[,] approximately $5 million to a parent whose child was killed[,] and approximately $2.5 million to a plaintiff whose sibling was killed." *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) ("*Heiser I*") (footnotes omitted). These amounts, however, are merely guideposts, and courts should deviate depending on the circumstances. *See Fraenkel v. Islamic Republic of Iran*, *Ministry of Foreign Affairs*, 892 F.3d 348, 361–62 (D.C. Cir. 2018). As relevant here, courts have increased solatium damages in those circumstances where the evidence demonstrates that the family members are experiencing more extreme effects of the loss of their loved one. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 85–86; *Stethem v Islamic Republic of Iran*, 201 F. Supp. 2d 78, 90-91 (D.D.C. 2002).

Solatium damages are also available to family members of injured victims. As the Special Master observes, several decisions have awarded solatium damages where the victim is still living ranging from $4 million for a spouse of the victim, $2.5 million for parents of the

10

victim, and $1.25 million for siblings of the victim.  Dkt. 60 at 29 (citing *Anderson v. Islamic Republic of Iran*, 839 F. Supp. 2d 263, 266 (D.D.C. 2012); *Kaplan*, 213 F. Supp. 3d at 38).

Turning to the case at hand, the record demonstrates that the death of John Hamen and the injuries to Mark McAlister have wrought profound harm to each of these families— emotional, physical, and financial.  Each family member has also presented to the Court and the Special Master evidence demonstrating his or her close relationship to the respective direct victims and the irreparable loss he or she continues to bear.  The Special Master has considered the individual circumstances of each of the plaintiffs and has recommended an amount for each.  Given the comprehensive evidence of devastating individualized grief and loss in the record, *see* Dkt. 32-7–12, the Court adopts the Special Master's recommendations regarding each of the family members of the direct victims.

    4.    *Punitive Damages*

Finally, Plaintiffs also seek punitive damages.  Dkt. 32 at 31–33.  Punitive damages "serve to punish and deter the actions for which they awarded."  *Valore*, 700 F. Supp. 2d at 87.  In its current iteration, the FSIA expressly contemplates the award of punitive damages.  *See* 28 U.S.C. § 1605A(c).  Pursuant to this Court's order on August 8, 2019, *see* Dkt. 59 at 1, the Special Master did not consider, and did not calculate, an appropriate award of punitive damages.  Rather, the Court reserved this task for itself, which it takes up now.

According to Plaintiffs, punitive damages are warranted in this case not only because of the outrageous conduct directed at Hamen and McAlister, but also because Iran's support of the Houthi militant group evinces "a particularly heinous disregard for the rule of law and the rule of nations."  Dkt. 50 at 65.  In particular, Plaintiffs contend that punitive damages are warranted

11

because Iran's provision of material support to the Houthis contravened the 2015 Joint Comprehensive Plan of Action, an agreement Iran entered into just months prior to the acts at issue here. *Id.* at 65–66. Plaintiffs, however, cite to no law, and the Court is unaware of any law, that makes alleged violations of international agreements, rather than the underlying outrageous acts, a central consideration in the award of punitive damages. The fact that this case involves the abduction, hostage taking, and murder of innocent men establishes Plaintiffs' right to punitive damages. That conduct is, by any measure, a violation of settled international norms and deplorable, and Iran's asserted violation of yet another international norm does not fundamentally change the calculus presented by Plaintiffs' application for an award of punitive damages.

That said, the Court is convinced that Plaintiffs are entitled to a substantial award of punitive damages. In determining the amount of punitive damages to award, courts typically consider four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Fritz*, 324 F. Supp. 3d at 65 (internal quotations and citations omitted). As to the first two factors, Iran's actions caused the Houthis deliberately and viciously to harm and then murder John Hamen and to abduct and hold Mark McAlister hostage for 192 days. Third, Iran's conduct of providing material support to militant groups for the purpose of harming Americans is "part of a longstanding pattern and policy, making the need for deterrence clear." *Hekmati*, 278 F. Supp. 3d at 166. Finally, "Iran is a sovereign and has substantial wealth." *Bluth v. Islamic Republic of Iran*, 203 F.Supp.3d 1, 25 (D.D.C. 2016).

In cases involving state-sponsored terrorism, most decisions from this court have applied a multiplier to a base amount (referred to as the "multiplicand"). *See Harrison*, 882 F. Supp. 2d at 50. As to the multiplicand, some decisions have utilized the defendant's annual expenditures on terrorist activities,[2] *see, e.g.*, *Valore*, 700 F. Supp. 2d at 88, while others have instead opted to use the amount of compensatory damages already awarded, *see, e.g.*, *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 106 (D.D.C. 2017), and still others have considered both these factors together, *see, e.g.*, *Hekmati*, 278 F. Supp. 3d at 166–67.

For present purposes, the Court concludes that the appropriate multiplicand is the total compensatory damages already awarded. The reason is that Plaintiffs have not provided sufficient evidence as to Iran's expenditures nor are the acts underlying this case as "exceptionally" deadly or substantial as those in cases where the total-expenditures multiplicand has been used. *See* Dkt. 50 at 64 (conceding that plaintiffs "didn't put on a lot of testimony" about Iran's expenditures because that method of calculating punitive damages has, on Plaintiffs' view, "fallen out of favor"); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 55 (D.D.C. 2010) (using the total-expenditures multiplicand for claims arising from the Beirut bombing where 241 Americans were killed); *but see Cronin*, 238 F. Supp. 2d at 236 (utilizing the total-expenditures multiplicand where plaintiff was abducted and held captive for four days).

---

[2] A different yet similar version of this method is to forgo the multiplicand and multiplier approach and instead impose a fixed sum of $300 or $150 million per family. *See Cohen v. Islamic Republic of Iran*, No. 12-1496, 2017 LEXIS 118770, at *71 (D.D.C. July 3, 2017) (collecting cases).

This leaves, then, only the question of the appropriate multiplier. Courts in this jurisdiction have frequently used a multiplier between one and five depending on various factors, including, among other things, whether the case involved exceptional circumstances, the perceived deterrence effect, the nexus between the defendant and the injurious acts, and the evidence plaintiffs presented regarding the defendant's funding for terrorist activities. *See, e.g.*, *Moradi*, 77 F. Supp. 3d at 73 (multiplier of 1 where Iranian authorities directly detained and tortured, but did not kill, plaintiff); *Hekmati*, 278 F. Supp. 3d at 167 (same); *Fritz*, 324 F. Supp. 3d at 65 (multiplier of 2 for a case involving hostage-taking and killing by terror organization the defendant supported); *Harrison*, 882 F. Supp. at 50 (multiplier of 3 for the bombing of the U.S.S. Cole where plaintiffs presented no evidence relating to defendant's expenditures on terrorist activities); *Haim*, 784 F. Supp. 2d at 3 (multiplier of 3 for a suicide bombing that killed eight); *Valore*, 700 F. Supp. 2d at 88 (multiplier of 5 for victims of the Beirut bombing where plaintiffs presented expert testimony on the deterrence effect of punitive damages).

Turning to this case, the Court finds that one of its prior opinions, *Fritz*, involved a closely analogous set of circumstances and thus provides an appropriate benchmark. In *Fritz*, the Court found that Iran provided material support to a terrorist organization that abducted, tortured, and later executed the plaintiff. *See Fritz*, 324 F. Supp. 3d at 58. In light of those findings and awards entered in previous cases, the Court found a "multiplier of two [was] appropriate in [that] case." *Id.* at 65. A multiplier of two is likewise appropriate here. Although undoubtedly heinous, the underlying acts here do not differ in kind from the conduct in *Fritz*, and, Plaintiffs have presented scant evidence regarding the potential deterrence effect of a larger multiplier. Accordingly, the Court will utilize a multiplier of two. Because the compensatory damages

already awarded total $84,289,948, the Court awards punitive damages in the amount of $168,579,896.  Consistent with other decisions in this circuit, the award of punitive damages will be apportioned among the estate and each individual plaintiff "relative to their individual compensatory awards."  *Cohen II*, 268 F. Supp. 3d at 28.

## CONCLUSION

The Court will enter a separate order awarding damages to Plaintiffs as described above.

/s/ Randolph D. Moss  
RANDOLPH D. MOSS  
United States District Judge

Date: September 10, 2019